## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:24-cr-00077 |
| | ) | |
| SANDRA GRIMES | ) | |

## PLEA AGREEMENT

The defendant, **SANDRA GRIMES,** represented by her counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF THE DEFENDANT

1.    The defendant understands her rights as follows:

    a.    To be represented by an attorney;

    b.    To plead not guilty;

    c.    To have a trial by an impartial jury;

    d.    To confront and cross-examine witnesses and to call witnesses and produce other evidence in her defense; and

    e.    To not be compelled to incriminate herself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.    The defendant waives rights b through e, listed above, and pleads guilty to Count 1 of the Second Superseding Indictment, charging a violation of Title 18, United States Code, Sections 1958, Conspiracy to Commit Murder for Hire, and Count Two of the Second Superseding Indictment, charging a violation of Title 18,

1

United States Code, Section 924(h), Transfer of a Firearm to be used to Commit a Felony.

3.    The defendant understands that the statements she makes under oath in the plea of guilty must be completely truthful and that she can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.    The defendant expects the Court to rely upon her statements here and her response to any questions that she may be asked during the guilty plea hearing.

5.    The defendant is not under the influence of alcohol, drugs, or narcotics.  She is certain that she is in full possession of her senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.    The defendant has had the benefit of legal counsel in negotiating this Plea Agreement.  She has discussed the facts of the case with her attorney, and her attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against her.  The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.    The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt.  The defendant and her counsel have discussed possible defenses to the charge.  The defendant believes that her attorney has represented her faithfully, skillfully, and diligently, and she is completely satisfied with the legal advice of his attorney.

2

8.      A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing.  The Factual Resume is incorporated by reference into this Plea Agreement.  The defendant and the United States agree that the Factual Resume is true and correct.  Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and her counsel are not part of this agreement and are not agreed to by the United States.

9.      This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court will impose.  The defendant is pleading guilty because she is guilty.

10.     The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.  This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.     The maximum penalty the Court could impose as to Count 1 of the Second Superseding Indictment is:

a.      Up to 10 years imprisonment;

b.      A fine not to exceed $250,000;

3

c.    A term of supervised release of at least 3 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, she could be imprisoned for the entire term of supervised release;

d.    A mandatory special assessment of $100.00; and

e.    Such restitution as may be ordered by the Court.

12.    The maximum penalty the Court could impose as to Count 2 of the Second Superseding Indictment is:

a.    Up to 15 years imprisonment;

b.    A fine not to exceed $250,000;

c.    A term of supervised release of at least 3 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.    A mandatory special assessment of $100.00; and

e.    Such restitution as may be ordered by the Court.

## SENTENCING

13.    The Court will impose the sentence in this case.  The United States Sentencing Guidelines are advisory and do not bind the Court.  The defendant has reviewed the application of the Guidelines with her attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation.  The defendant understands that at sentencing, the

4

Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that she will not be allowed to withdraw her guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

14. The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

15. The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

16. Both the defendant and the United States are free to allocute fully at the time of sentencing.

17. The defendant agrees to tender $200.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

Rev. 9/2021

## RESTITUTION

18.    Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is mandatory.  The defendant agrees to make full restitution in an amount to be determined by the Court at sentencing.

## FORFEITURE

19.    The defendant agrees to forfeit to the United States any right, title, and interest in all assets subject to forfeiture under the notice of forfeiture contained in the charging document, including property specified in any bill of particulars and property previously seized by the government for administrative, civil, or criminal forfeiture. The defendant further consents to the filing of a motion for a preliminary order forfeiting such property and any dollar amount specified in the notice of forfeiture or bill of particulars, and the defendant confesses the requisite nexus between the property and the charge of the conviction. The defendant hereby withdraws any petition for remission or claim for such property for such property and further waives any right to contest or appeal the government's forfeiture proceedings for any reason, including on grounds that the forfeiture constitutes an unconstitutionally excessive fine or punishment, and in any manner, including by claim, petition, appeal or collateral attack.

## FINANCIAL OBLIGATIONS

The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial

Rev. 9/2021

obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

20. The United States will not bring any additional charges against the defendant related to the facts underlying the Second Superseding Indictment and will move to dismiss any remaining charges against the defendant once sentence is imposed in this case. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

21. The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

22. The defendant understands and agrees that she has no right to cooperate, and that the decision whether to allow her to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

    a. The defendant shall fully, completely, and truthfully respond to all questions put to her by law enforcement authorities regarding the underlying facts of the offense(s) with which she is charged, as well as the

7

underlying facts of any criminal offense(s), state or federal, of which she has information or knowledge.

b. The defendant acknowledges that she understands that she shall provide truthful and complete information regarding any offense about which she has knowledge or information regardless of whether law enforcement authorities question her specifically about any such offense. This provision requires the defendant to divulge all information available to her even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c. The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which her cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance she shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d. If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any

8

polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.  The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in her possession or under her control and which are relevant to her participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense.  This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.  The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.  If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable.  The United States specifically reserves the right to make the decision relating to the

9

extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should she provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h. The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by her from her illegal activities or obtained by others associated with her or of which she has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

Rev. 9/2021

(1)  permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)  permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement.  The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during her breached cooperation.  Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i.  Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during her cooperation.  The defendant acknowledges and agrees that the information that she discloses to the United States pursuant to this agreement may be used against her in any such prosecution.

11

Rev. 9/2021

j. The United States and the defendant agree that the defendant will continue her cooperation even after she is sentenced in the instant matter.  Her failure to continue her cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement.  Under these circumstances, the defendant expressly waives any rights she may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

23.    As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge her guilty plea, conviction, or sentence in any district court or appellate court proceedings.

a.    **EXCEPTIONS.**  The defendant reserves the right to timely file a direct appeal challenging:

(1)    any sentence imposed in excess of the statutory maximum;

(2)    any sentence which constitutes an upward departure or variance from the advisory guideline range.

12

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

24. If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

25. The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

26. If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

27. The defendant understands that if she breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that she might have under the Sixth Amendment and/or Speedy Trial Act.

28. In addition, if the defendant is released from detention prior to sentencing, she understands that the United States will no longer be bound by this agreement if she violates any condition of her release prior to sentencing or prior to serving her sentence after it is imposed.

Rev. 9/2021

## ENTIRETY OF AGREEMENT

29.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,
SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: October 21, 2024          */s/ Jessica S. Terrill*
Jessica S. Terrill
Assistant United States Attorney

Date: October 21, 2024          */s/ Tandice Blackwood*
Tandice Blackwood
Assistant United States Attorney

Date: October 21, 2024          */s/  Kacey Chappelear*
Kacey Chappelear
Assistant United States Attorney
Deputy Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offenses charged in the Second Superseding Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

14

Rev. 9/2021

Date: 10-25-24

Sandra Grimes
Defendant

I am the attorney for the defendant.  I have fully explained her rights to her with respect to the offense(s) charged in the Second Superseding Indictment in this matter.  I have carefully reviewed every part of this Plea Agreement with her.  To my knowledge, her decision to enter into this agreement is an informed and voluntary one.  I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, her decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date:

Michael Hickman, Defense Counsel

Rev. 9/2021

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:24-cr-00077 |
| | ) | |
| SANDRA GRIMES | ) | |

**FACTUAL RESUME**

The defendant, **SANDRA GRIMES**, admits the allegations of Count One and Count Two in the Second Superseding Indictment.

**ELEMENTS OF THE OFFENSE**

**SANDRA GRIMES** understands that in order to prove a violation of Title 18, United States Code, Section 1958(a), as charged in Count One of the Second Superseding Indictment, the United States must prove:

First:     two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit murder for hire, as charged in the Second Superseding Indictment, the elements of which are as follows:

   a)     the defendant used, or caused another to use, the mail or any facility of interstate or foreign commerce;

   b)     the use was with the intent that a murder be committed in violation of the laws of any State or the United States; and

   c)     the murder was consideration for the receipt of, or a promise or agreement to pay, anything of pecuniary value;

Second:     the defendant knew the unlawful purpose of the plan and willfully joined in it.

Rev. 9/2021

1

**SANDRA GRIMES** understands that in order to prove a violation of Title 18, United States Code, Section 924(h), as charged in Count Two of the Second Superseding Indictment, the United States must prove:

First:    The defendant knowingly received or transferred a firearms or ammunition, or attempted or conspired to do so;

Second:    knowing or having reasonable cause to believe that such a firearm or ammunition would be used to commit a felony, a federal crime of terrorism or a drug trafficking crime.

## OFFENSE CONDUCT

Defendant, **SANDRA GRIMES**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **GRIMES'S** plea of guilty. The statement of facts does not contain each and every fact known to **GRIMES** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

On May 3, 2024, through May 6, 2024, codefendant Rebecca Murphy provided information to the Federal Bureau of Investigation ("FBI") regarding a Murder-for-Hire scheme. Specifically, in February 2024, Murphy was hired by Sandra **GRIMES** and her sisters, Judy Owen and Mitzy Smith, to murder Grimes' son-in-law, R.M. **GRIMES** and Owen informed Murphy that R.M. physically assaulted **GRIMES'S** daughter and their children. Due to this and an ongoing custody dispute, the sisters wanted Murphy to kill R.M. Later analysis of **GRIMES'S** and Owen's phones showed the sisters' conspiracy to find someone to kill R.M. began in approximately April 2023.

2

For a period of time, Smith and Murphy lived next door to one another in Fairhope, Alabama. Murphy met Smith through Smith's daughter. Smith introduced Murphy to **GRIMES** and told **GRIMES** that Murphy "would be perfect for the plan because she is sneaky." A short time later, in approximately early to mid-February 2024, Murphy was approached by **GRIMES** and her sisters, Smith and Owen to murder **GRIMES'S** son-in-law, R.M.

In approximately mid-February 2024, Murphy's dog was sick and was treated by a veterinarian in Foley, Alabama. In order to obtain the dog, Murphy owed an additional $500, that she could not pay. Owen paid the money for Murphy to obtain her dog. Afterwards, Owen stated because she paid the bill, then Murphy had to kill R.M. Owen immediately drove Murphy to a Walmart parking lot located in either Fairhope or Daphne, Alabama. At the Walmart parking lot, they met up with **GRIMES**, switched vehicles into **GRIMES'S** vehicle, which was a red Buick Envision bearing license plate Z216WH. Then, **GRIMES** drove Owen and Murphy to Louisiana. Murphy said this trip was to show her R.M.'s house located in Marrero, Louisiana. There, they physically passed by R.M.'s house several times. Afterwards, they drove back and did not stay the night anywhere.

The purpose of the trip was to inform Murphy of the things R.M. did to **GRIMES'S** daughter and to convince Murphy to murder him. Since R.M. was an alleged drug user, **GRIMES** and Owen wanted the murder to appear as an overdose. They wanted Murphy to inject R.M. with a lethal dose of heroin via a needle. However, texts show that ultimately, they did not care if Murphy had to slit R.M.'s throat, as long as she got the job done. They also discussed other options on ways to kill R.M.

Within approximately one week, Owen picked up Murphy and they drove back to Marrero, Louisiana for their second trip. Before checking-in to the Siesta Motel, they drove past R.M.'s

3

Rev. 9/2021

residence and his place of business. The following day they met with **GRIMES** and Nicole Bauer who were already in Marrero. Bauer and R.M. had a hearing at the Jefferson Parish Courthouse regarding child custody issues. Owen and **GRIMES** wanted Murphy to kill R.M. outside of the courthouse, however Murphy refused stating it was daylight and too many cameras. Afterwards, they drove back to Alabama.

License plate reader information revealed that **GRIMES'S** aforementioned Buick drove eastbound on I-10 on February 20, 2024, in Mobile, Alabama at approximately 3:14 p.m. and then in Harold, Florida at approximately 4:46 p.m. Shortly after the second trip, in approximately early March 2024, Smith delivered a box of what appeared to be Christmas decorations to Murphy. This exchange occurred in Fairhope, Alabama. The purpose of this was to transfer a firearm to Murphy for the murder. Located at the bottom of the box given to Murphy by Smith was a 9mm Phoenix Arms handgun. The serial number on the gun was obliterated. The magazine located in the gun contained three bullets.

**GRIMES** and Owen informed Murphy they had already paid another man to murder R.M., but he ran off with the money. Murphy agreed to the scheme, but stated they had to pay her more. After they returned from the day trip, Owen gave Murphy $350 cash to purchase the heroin. In addition, Murphy owed her mother $300 for bond. Owen gave Murphy $300 cash to repay her mother.

Shortly after receiving the gun in or about early March 2024, Murphy and her girlfriend traveled from Alabama back to Marrero. They stayed a few days at the same Siesta Motel until motel management learned about their dog. Then, they moved to another hotel. They stayed in Louisiana for approximately one week. The sisters, **GRIMES**, Owen, and Smith wanted the hit "carried out" during this stay.

4

Murphy provided to the FBI two phones in which she communicated regularly with **GRIMES** and Owen. Murphy, **GRIMES**, and Owen utilized two phones each. They each had a personal phone and a "burner" phone used to conceal their communications during the conspiracy. To disguise their communications, **GRIMES** paid for minutes on Murphy's second phone and stated her code name was "Jack" and Murphy's was "Bob" and "B." Even though they had the second lines for coded messages, they often switched back and forth by utilizing their primary telephone numbers and these second telephone numbers to discuss murder for hire plans.

Detailed below are communications between Murphy and **GRIMES** wherein they switch between their primary telephone numbers and their secondary telephone numbers.

On or about March 4, 2024, **GRIMES** as "Jack" sent a photograph of R.M. and his vehicle license plate.  On or about March 6, 2024, Murphy responded "So there is no more confusing." **GRIMES** replied "We need that darn gun! Find it, it has your prints on that. Listen to me." / "I am not going to do u wrong!" / "I am the smart one. Trust me, I'm not gonna stare you wrong but you got to, get that thing out of these woods because if they find it, it's got your prints on it.  They will test that." / "That b**** was supposed to win in the d*** water." / "Go into."

On or about March 7, 2024, Murphy sent **GRIMES** pictures of the aforementioned Phoenix Arms gun that the sisters had provided Murphy for the murder.  **GRIMES** instructed Murphy to bring it back and she would take care of it and no one will ever find it.  **GRIMES** also stated, "Don't dump that" and told Murphy to go by there and "scope it out."  Murphy informed **GRIMES** that she obtained a "very big ugly mean Cajun" to assist her.  **GRIMES** replied with the same message twice "Please get this done so yall can get back."  **GRIMES** then sent a photograph of a bedroom and stated it was "his." Then **GRIMES** sent additional photographs to Murphy of the interior of a home stating which rooms were the children's, the kitchen and other rooms.

5

Additionally, **GRIMES** described to Murphy the locations of windows and what rooms certain doors opened into.

On March 8, 2024, Murphy sent **GRIMES** a video while in a vehicle and it was raining. Murphy joked about a possible accident involving "Raul." They again discussed hiring a man to assist Murphy. **GRIMES** told Murphy she was serious and to "Give friend this # not my other ph and tell him to call me."

On March 9, 2024, **GRIMES** texted Murphy "So what ya going to do. Well damn with storm no one will hear the gun and pull the brakes on the house." / "He would think the damn lights went out" / "This would be your d*** perfect time even though it's gonna be raining. Nobody will hear anything and nobody, can tell the wiser." / "I'm telling you this is your damn perfect night." / "Go on the side of the house and pull that big a** or I'm d***it shuts all the power off and the entire house." Murphy replied to **GRIMES** the man was on his way (to assist). **GRIMES** replied back "Tell him I love him." Murphy stated, "That's between you and that man miss Sandra."

Murphy further stated she would wear a mask and afterwards would disappear. **GRIMES** texted "This is the purpose of taking his ass out is so the kids don't live in hell" / "Please don't make any mistakes. Them kids are mine and Nicole's life." Murphy replied, "That's why I'm doing it alone." Later on, **GRIMES** asked if she should chance it with the friend. Murphy replied, "please send his deposit he said he will wear a mask" and asked whose room had blue lights. **GRIMES** said it was the girls' room in the front of the house and informed Murphy of a broken blind. Murphy stated they planned to get him at about 3 or 4 when everyone should be asleep.

On March 10, 2024, Murphy texted **GRIMES** that they were on their way back to Alabama where she could find someone to help her so that she does not get overpowered since he was a

6

man, and she was a woman. **GRIMES** replied, "I don't know what to tell ya, I want the gun and bullets brought back and if u coming back. I don't have anymore money.that guy took the last cash I had. Please don't tell me no bullshit about the MF do what ya gota do. I don't know. Hubby is home I am headed to wk in two hours. This has turned into a real shitshow. Not passed off but this MF tendes to get awY with shit again. That's ok his funding day will come now! With or with out u. U stab him in the heart at the door or shoot his ass in the heart or face at the what the f can he do." / "Far as the MF messing with them kids. Yes I know the bastard is. I been saying this I could not get anyone to listen: I am on my verge of going f postal on his ass." **GRIMES** also copied this communication to and from Murphy and sent it to Owen.

Through text, **GRIMES** and Murphy further discussed getting someone to assist Murphy in the killing. **GRIMES** stated, "If I am paying someone to do then this is the purpose of me not being there.i either going all the way or I am not going." **GRIMES** later stated there were two parades that day in Gretna and to "catch his ass." They continue to text, but ultimately Murphy and her girlfriend returned to Alabama.

On March 22, 2024, **GRIMES** texted Murphy stating, "Read this shit, B if you don't do something or get someone to help then I will go and do the shit my damn self" and sent screenshots of text messages between R.M. and Bauer arguing.

On March 23, 2024, Owen utilizing her aforementioned second telephone number texted Murphy, "R u going back there can u pay the person an we will pay u back,we already gave u money." Murphy complained that Owen was mean and that she planned to tell "sister Sandra". Owen replied, "If u not go do nothing we want our money back we got better places to put it". / "I'm the one who paid for your dog ,my friend who works for the vet knows I paid.I want progress or my money u pick (with an angry faced emoji)."

7

On April 5, 2024, **GRIMES** texted Murphy stating "I really need what money was dished out for. . ."

Other than the vet bill being paid, Murphy was paid for her stay in Louisiana and other monies—given in cash and via CashApp. Between March 7, 2024, to April 21, 2024, **GRIMES** sent Murphy approximately $1,010 via CashApp. Once Murphy returned to Alabama, **GRIMES** continued to pay her in increments.

Through early May 2024, Murphy, **GRIMES**, Owen, and Smith communicated about the conspiracy to kill R.M. and efforts to carry it out. **GRIMES** texted Owen, "That dumb bitch called me to get rid of my phones! That dumb ass is high and tripping. I told her don't call me with that bullshit!" Owen responded, "Act like you don't know what she's talking about ask her what phone." On that same day, GRIMES text Owen, "Judy that bitch blabs she will be done. I will take the hit, but I be shit if something come on you and Mitzy!" Owen responded, "She just drugged up she b ok tomorrow."

Through early May 2024, **GRIMES** and Owen discussed other people Murphy had hired to potentially help her kill R.M. and shared news articles of murders in the area of where R.M. resides "hoping" it was R.M.

An expert with the Firearms/Toolmarks Unit of the FBI examined the .22 caliber Phoenix Arms pistol for purposes of operability and processing of the obliterated serial number. A recoil spring and magazine from the lab was used to successfully test fire the pistol and confirm operability. The restoration of the serial number was unsuccessful. Additionally, an ATF expert confirmed the 9mm Phoenix Arms handgun to be a firearm as defined by Tile 18 U.S.C., Chapter 44, Section 921(a)(3) and that the firearm was manufactured outside the state of Alabama. The ammunition was not recovered.

8

As part of her guilty plea in this case, **GRIMES** admits that: (1) two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit murder for hire, as charged in the Second Superseding Indictment; and (2) she knew the unlawful purpose of the plan and willfully joined in it. In particular, **GRIMES** admits that she and others (a) used and caused others to use facilities of interstate commerce, including but not limited to cell phones, social media accounts, and vehicles; (b) that such use was with the intent that a murder be committed in violation of the laws of the State of Alabama and the State of Louisiana and other states; and (c) that the murder was consideration for the receipt of, or a promise or agreement to pay, anything of pecuniary value.

As part of her guilty plea in this case, **GRIMES** admits she knowingly transferred a firearm and/or ammunition, and conspired to do so, knowing or having reasonable cause to believe that such a firearm would be used to commit a felony—murder.

AGREED TO AND SIGNED.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: October 21, 2024          /s/ Jessica S. Terrill
                                Jessica S. Terrill
                                Assistant United States Attorney

Date: October 21, 2024          /s/ Tandice Blackwood
                                Tandice Blackwood
                                Assistant United States Attorney

Rev. 9/2021

Date: October 21, 2024         _/s/_  _Kacey Chappelear_

                                       Kacey Chappelear
                                       Assistant United States Attorney
                                       Deputy Chief, Criminal Division

Date: _____

                                       Sandra Grimes
                                       Defendant

Date: _____

                                       Michael Hickman, Esq.
                                       Attorney for Defendant

10

Rev. 9/2021